UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br>v.<br><br>JOSHUA SADAT WASHINGTON,<br><br>Defendant. | Case No. 2:16-cr-00279-JAD-PAL<br><br>**REPORT OF FINDINGS AND RECOMMENDATION**<br><br>(Mot. Suppress – ECF No. 54) |

Before the court is Defendant Joshua Sadat Washington's ("Washington") Motion to Suppress (ECF No. 54) which was referred for a Report of Findings of Recommendation pursuant to 28 U.S.C. § 636(b)(1)(A) and LR IB 1-3 of the Local Rules of Practice. The court has considered the Motion, the government's Response (ECF No. 85), Washington's Reply (ECF No. 97), and evidence adduced at an evidentiary hearing conducted December 11, 2017.

## BACKGROUND

### I. The Charging Documents and Procedural History

Washington was initially charged in a Criminal Complaint (ECF No. 1) sworn out and filed on August 17, 2016, at 5:07 p.m., by the Honorable Nancy J. Koppe. The initial complaint charged Washington with interference with commerce by robbery in violation of 18 U.S.C. §§ 1951 and 2, and transportation of stolen goods in violation of 18 U.S.C. §§ 2314 and 2. The interference with commerce by robbery charge arises out of a robbery at a Las Vegas jewelry store that occurred on August 13, 2016. The transportation of stolen goods is alleged to have occurred on August 14, 2016. The affiant on the complaint was FBI Special Agent Mollica. The information used to support the complaint was derived from reports of information obtained from eyewitnesses to the offense described in the complaint and investigations conducted by law enforcement related to the incident. Complaint (ECF No. 1) ¶ 2.

The complaint alleges that on August 13, 2016, at approximately 9:25 a.m., two employees of Alfredo's Jewelry, located at 5775 S. Eastern Avenue, in Las Vegas, Nevada, were preparing to open for the day. *Id.* ¶ 3. The store normally receives a shipment from FedEx every Saturday morning. *Id.* The front door of Alfredo's is electronically locked and customers must be "buzzed in" to enter. *Id.* Store employees observed what appeared to be a FedEx delivery person at their front door trying to buzz in with a box and what appeared to be a FedEx scanner. This individual is described as suspect number 1. *Id.* He was buzzed into the store, entered, and set the box and scanner down. *Id.* The individual pulled a silver-grey semiautomatic handgun from the box and pointed it at a store employee. *Id.*

A second suspect then rushed into the business. *Id.* ¶ 4. Suspect no. 1 ordered everyone to the ground and used thick, white zip ties to bind the two employees' hands behind their back. *Id.* Both suspects began taking jewelry from the safes and attempted to obtain the contents of a cash box. *Id.* The second suspect kicked an employee in the face. *Id.* A witness at a nearby suite noticed two males suspiciously get in a vehicle and speed off and observed one of the victims in the jewelry store pleading for help. *Id.* ¶ 5. The witness called 911 and freed the victims from their restraints. *Id.* A second witness visiting a nearby Starbucks observed two black males leave the store, one of whom was carrying a FedEx bag which was dropped and had to be retrieved. *Id.*

The loss to Alfredo's jewelry was estimated at approximately $10,000.00 in cash, and $100,000.00 to $300,000.00 in jewelry which included rings, bracelets, earrings, pendants, coins, customer jewelry being repaired, and customer jewelry on consignment. *Id.* ¶ 7. Video surveillance recovered from Alfredo's jewelry captured the suspects during the robbery. *Id.* Witnesses provided additional descriptions of both suspects. *Id.*

On August 16, 2016, UPS in Florida alerted to a heavy, suspicious package with a final destination for an apartment complex known for drug activity. *Id.* ¶ 9. Further examination by UPS determined the package was full of jewelry. *Id.* The jewelry was packaged in additional FedEx packages within the original package. *Id.* UPS contacted a local police department who contacted the Miami FBI field office. *Id.* Investigators from the Miami FBI field office responded to the UPS distribution center in Hialeah, Florida, and determined that there were tags still attached

to the jewelry and receipts enclosed in the package from Alfredo's jewelry. *Id.* Investigators seized the package for evidentiary purposes. *Id.* UPS advised that the "shipper" called August 16, 2016, and requested that the package be changed to pick up at the distribution center. *Id.*

A sample of items from the package was photographed and forwarded to investigators in Las Vegas, Nevada. *Id.* ¶ 10. Investigators in Las Vegas shared the photographs with Alfredo Jewelry employees who confirmed it was their merchandise. *Id.* The shipping label on the package indicated the package was to be shipped to J. Washington and David Nolen at an apartment in Miami, Florida by UPS next day air. *Id.* ¶ 11. It also contained a tracking number which was described in the complaint. *Id.*

UPS determined that the package was shipped from UPS Store No. 0097 on Flamingo Road in Las Vegas. *Id.* ¶ 12. Investigators in Las Vegas contact UPS employees at the store who provided the parcel shipping order indicating the customer shipping the package on August 14, 2016, was Joshua Washington who listed an address on East Flamingo in Las Vegas Nevada, and provided a phone number with a 305 area code. *Id.* The contents of the package were described as bands, beads, etc. with a declared value of $100.00. *Id.* A UPS shipment receipt indicated the package weighed 30 lbs., and the expected delivery date was August 16, 2016. *Id.* The shipment receipt is dated August 14, 2016, at 11:58 a.m. Pacific time. The video surveillance system at the Las Vegas UPS store was not functional at the time of the transaction. *Id.*

Investigators learned that the East Flamingo, Las Vegas, Nevada address on the shipping label was a Storage West self-storage facility. *Id.* ¶ 13. Investigators interviewed the facility manager and determined that Washington began renting the unit listed on the shipping label on June 16, 2016. *Id.* On the Storage West occupant information form, Washington provided his social security number and a home phone number. *Id.* Facility managers also indicated that they had contacted Washington at the number he provided when his rent was past due. *Id.* Washington also provided a copy of his Arizona driver's license that was issued on August 13, 2014, which listed his date of birth as August 2, 1980, with a height of 5'11" and weight of 160 lbs. *Id.*

Storage West also provided investigators with an access log for the unit rented by Washington for the month of August 2016. *Id.* ¶ 14. The person using the gate code assigned to

3

Washington accessed the storage facility three times on August 2, 2016, twice on August 10, 2016, twice on August 11, 2016, once on August 12, 2016, four times on August 13, 2016, twice on August 14, 2016, and once on August 15, 2016. *Id.* Washington's gate code was used to enter the storage facility hours before and after the robbery which occurred at Alfredo's Jewelry on August 13, 2016, at approximately 9:25 a.m. *Id.* On August 14, 2016, someone used Washington's gate code to enter the facility approximately four hours before the package was shipped from the Las Vegas UPS store on East Flamingo Road. *Id.* Alfredo's Jewelry, Washington's storage unit, and UPS Store No. 0097 are all located in the same general area. *Id.* ¶ 15.

The complaint related that a search of a law enforcement database revealed various arrests for Washington dating back to 1996 for various offenses including "arm robbery" and "stgarm robbery" in Florida. *Id.* ¶ 16. Law enforcement obtained driver's license photos for Washington from Arizona, Florida, and Nevada. *Id.* ¶ 17. Special Agent Mollica indicated that he believed Washington had facial features that resembled a close-up of surveillance photo of the second suspect in the Alfredo's Jewelry store robbery. *Id.* He also had similar, but not identical, features of the descriptions provided by witnesses. *Id.*

Investigators learned Nolen had a valid driver's license issued in the State of Florida with a name and address which were the same as the name and destination address on the UPS package shipped from Las Vegas containing jewelry from the Alfredo's Jewelry robbery on August 13, 2016. *Id.* ¶ 18. Nolen appeared at the UPS distribution center in Hialeah, Florida to pick up the UPS package at issue on August 16, 2016. *Id.* ¶ 19. Nolen was turned away and did not receive the package. *Id.*

On August 17, 2016, Washington showed up with another individual to pick up the package at the UPS distribution center in Hialeah, Florida. *Id.* ¶ 20. He was confronted and refused to provide his name. *Id.* However, his Florida driver's license was on his person. *Id.* The person with him, Willis, identified Washington as his friend "Josh." *Id.* Willis stated that Washington had just picked him up from the airport and took him to UPS to pick up a package. *Id.* Willis returned home after spending Saturday through Thursday in Las Vegas, Nevada. *Id.*

Investigators learned that Washington arrived at the UPS distribution center in Florida in his silver 2012 Hyundai Sonata bearing Arizona license plates. *Id.* ¶ 21. The vehicle was impounded following Washington's arrest, and American Airlines flight information found in the vehicle showed Washington departed Las Vegas, on August 14, 2016, flying to Phoenix and continued on to Ft. Lauderdale, Florida. *Id.* A search warrant was obtained for the vehicle to retrieve the documents. *Id.*

Judge Koppe found probable cause to believe that Washington committed the offenses charged in the complaint and the complaint was filed by her chambers.

Washington was arrested in the Southern District of Florida (Miami) where he made an initial appearance on August 18, 2016, and was detained pending a removal hearing set for August 23, 2016. He was committed to the District of Nevada and an order of transfer entered. *See* Rule 5(c)(3) documents received from the Southern District of Florida (ECF No. 2). Washington made his initial appearance in this district on September 19, 2016. *See* Minutes of Proceedings (ECF No. 3). The Federal Public Defender's Office was appointed as counsel and requested a two-day continuance of the detention hearing which was granted by the presiding duty judge, Judge Koppe. He was detained following a detention hearing held on September 21, 2016. S*ee* Minutes of Proceeding (ECF No. 7); Order of Detention (ECF No. 14).

On September 28, 2016, the federal grand jury returned an indictment charging Washington with interference with commerce by robbery and transportation of stolen goods. *See* Indictment (ECF No. 11). He appeared for an arraignment and plea on the indictment before the Honorable George W. Foley, Jr. on October 5, 2016. *See* Minutes of Proceedings (ECF No. 15). Trial was set for Tuesday, December 6, 2016, at 9:00 a.m., with calendar call on November 28, 2016.

A Superseding Indictment (ECF No. 19) was filed November 9, 2016, charging Washington and co-defendant Fedel Ezekiel Sakers with interference with commerce by robbery and transportation of stolen goods. Washington and co-defendant Sakers appeared for an arraignment and plea on the superseding indictment on November 17, 2016. *See* Minutes of

/ / /

Proceedings (ECF Nos. 23, 24).  The trial date was continued to December 20, 2016, with calendar call on December 12, 2016.  *Id.*

A Second Superseding Indictment (ECF No. 29) was returned January 25, 2017, which charged both defendants with the additional count of brandishing a firearm in furtherance of a crime of violence in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2.  Washington and Sakers appeared for an arraignment and plea on the second superseding indictment on February 2, 2017. *See* Minutes of Proceedings (ECF Nos. 33, 34).  The trial date was reset for March 28, 2017, with calendar call on March 20, 2017.

The parties have stipulated to numerous continuances of the calendar call, trial date, and motions deadline since the second superseding indictment was returned.  At the time the evidentiary hearing was held, trial was set for January 9, 2018.  *See* Stipulation (ECF No. 89); Order (ECF No. 93).

## II.    THE MOTION TO SUPPRESS

### A.  Washington's Motion

In the current motion, Washington seeks to suppress evidence recovered during a search of a UPS parcel shipped from Las Vegas to Florida and opened in Florida, as well as derivative evidence obtained during a search of two LG cellphones recovered following Washington's arrest in Florida and a Storage West storage unit searched in Las Vegas, Nevada.  The cellphones and storage unit were searched pursuant to search warrants issued in the District of Nevada. Washington argues that the search of the UPS package is presumptively unreasonable under the Fourth Amendment because it was conducted by law enforcement without a warrant.  He also argues that all derivative evidence obtained during the course of the investigation as a result of the search of the UPS package is tainted and should be suppressed under the fruit of the poisonous tree doctrine.

Washington argues that his expectation of privacy in the contents of the package was not extinguished when he mailed it from Las Vegas to Florida.  He also maintains that, based on the discovery produced in this case, it is unclear whether UPS's alleged "limited role" in the search was under the direction of the FBI.  The motion opines that the UPS security officer who opened

the package, Andrew Davis, "may have acted as a government instrument" rather than as a private citizen. Citing *United States v. Reed*, 15 F.3d 928, 930–31 (9th Cir. 1994), the motion argues that the relevant inquiry in determining whether a private citizen is acting as a government agent is: (1) whether the government knew of and acquiesced in the intrusive conduct; and (2) whether the party performing the search intended to assist law enforcement efforts or further his own ends. He also maintains that even if UPS had previously searched the package before turning over its contents to law enforcement, the government may not exceed the scope of a private search. The motion cites *United States v. Jacobsen*, 466 U.S. 109, 115–16 (1984), for the proposition that any additional invasion of his privacy by a government agent "must be tested by the degree to which they exceeded the scope of the private search."

He requested an evidentiary hearing because discovery the government produced in this case does not establish the exact sequence of events, information known to UPS, and what search was conducted by the FBI of the contents of the UPS package. The motion suggests that law enforcement officers may have exceeded the scope of any private search and an evidentiary hearing was required to determine the precise scope of each search "as the government's discovery does not provide a clear timeline." Specifically, the motion contends that there is a discrepancy regarding who did the bulk of the search of the initial UPS package. The government did not provide an FBI 302 regarding the extent of the search done by agents after being called by UPS. UPS claims it had a limited role. Based on the discovery the government produced, it does not appear that the FBI did the majority of the search. However, the discovery did not indicate "precisely what Mr. Davis exactly saw in the package before or after agents arrived on August 16, 2016." For all of these reasons, an evidentiary hearing was requested to determine the scope of each private and government search.

Finally, the motion argues that evidence obtained during the warrantless search of the UPS package tainted the later-obtained search warrants, the first for the contents of two LG cellphones, and the second search warrant for the Storage West self-storage unit. Both search warrants contained information derived from a search of the contents of the UPS package. Without the tainted evidence, neither search warrant is supported by probable cause. The court should therefore

suppress all evidence obtained as a result of these two search warrants under the fruit of the poisonous tree doctrine. Copies of both search warrants are attached as exhibits to the motion.

**B. The Government's Opposition**

The government opposes the motion arguing that the initial search of the UPS package was conducted by a private entity, UPS. The government's opposition represented that on August 16, 2016, the parcel arrived at a UPS center in Florida. The label indicated the parcel had been mailed from Las Vegas, weighed 30 lbs., and was addressed to J. Washington and David Nolen in Miami. The driver believed the package might contain contraband and gave it to his supervisor, who in turn gave the unopened parcel to Andrew Davis, a UPS security supervisor. Davis believed the package might contain contraband and opened it. The UPS parcel was a cube-shaped cardboard box approximately 14 in. by 14 in. by 14 in. A Federal Express envelope was the only package inside the parcel which also contained a shirt and packing popcorn. Davis opened the envelope finding a substantial amount of loose jewelry, necklaces, rings, watches, and coin sets—many with price tags still affixed. He removed some of the items from the envelope, and believing they were suspicious, showed the parcel and its contents to Broward County Deputy Sheriff Julie Foster who was in Davis' office on another unrelated matter. The contents of the parcel were removed and placed on a desktop. Foster took photographs and emailed photos of the parcel's contents to the Las Vegas Metropolitan Police Department's robbery intelligence section. Metro contacted the FBI, and local FBI agents in Miami met with Davis who explained what had taken place.

Based on the statement of facts contained in the response, the government argues there was no Fourth Amendment violation because the initial search was conducted by a private entity and not law enforcement. The Fourth Amendment does not extend to searches and seizures conducted by private parties. A defendant challenging a private search on Fourth Amendment grounds has the burden to demonstrate government action. To meet this burden, a defendant must show that the private parties conducting the search acted as an "instrument or agent" of the government. A private person acts as an instrument or agent of the government when the government "authorizes, directs and supervises that person's activities and is aware of those activities." *United States v. Jones*, 231 F.3d 508, 517 (9th Cir. 2000). However, *de minimis* or incidental contacts between a

private person and law enforcement prior to or during the course of a search or seizure does not implicate the Fourth Amendment.

In this case, the government maintains that the UPS parcel was opened and its contents viewed by a private party, Andrew Davis, a UPS security supervisor, and that the government played no role in the search. The fact that Davis found the package suspicious and believed it might contain contraband and therefore may have been motivated by a desire to help law enforcement does not subject the private search to Fourth Amendment scrutiny. The government argues that this is because an intention to assist law enforcement is insufficient, in and of itself, to convert a private actor into a government actor for purposes of Fourth Amendment.

The government concedes that the police may not exceed the scope of a private search without an independent right to search. However, in this case, the subsequent search did not exceed the scope of the private search conducted by Davis. A law enforcement officer's viewing of what a private party has freely made available for inspection does not violate the Fourth Amendment. Here, Deputy Foster was the first law enforcement officer aware of the search of the parcel and its contents. There was no additional information to be learned from an examination of the parcel's contents. Therefore, subsequent police inspection and photographing of the parcel's contents revealed only information Davis had found in his initial search.

The government's response stated that Foster may have examined more items in the parcel than Davis initially did and that she may have examined the items more thoroughly. However, all of the items Deputy Foster examined were from the same parcel previously opened and inspected by Davis. Foster opened no additional packages and viewed only items Davis had previously viewed. Citing cases from the Fifth, Tenth and Eleventh Circuits, the government argues that Foster's subsequent examination and confirmation of information already known does not constitute a new search nor exceed the scope of the original search.

The government's response stated that Davis opened and viewed the contents of a single parcel, and that Deputy Foster's examination of the same contents from the same parcel "did nothing to further compromise Washington's expectation of privacy in the parcel." Therefore, no Fourth Amendment violation occurred and the motion to suppress should be denied.

## C. Washington's Reply

Washington replies that the government's response relies on a mistaken characterization of the search of the UPS parcel as a private search based on a naïve assumption about the lack of government interaction and control over UPS, a major interstate corporation. The reply argues that an evidentiary hearing would likely show distinct links between law enforcement personnel and UPS management and personnel. The reply also stated counsel's belief that an evidentiary hearing would show that about the time of Washington's arrest, there was direct cooperation between law enforcement and UPS, and pressure from law enforcement agents and personnel directly shaped the policies of UPS and its employees causing them to deliberately circumvent Fourth Amendment protections guaranteed to citizens of the United States.

The reply points out that mail searches have always been given special Fourth Amendment protection. Washington argues that UPS is a quasi-postal service and therefore UPS cannot claim it is immune from any scrutiny for its policies of engaging in "private searches" outside of the Fourth Amendment protection. The reply maintains that there is more than *de minimis* or incidental contact between UPS and the United States government, relying on *United States v. Jones*, 231 F.3d 508 (9th Cir. 2000). Since September 11, 2001, the United States government has actively monitored the transport of air packages when packages are transported by private mail or parcel delivery companies like FedEx or UPS. An evidentiary hearing will establish that the UPS security manager, Andrew Davis, was in fact operating both as a private security guard and as a quasi-government agent when he opened the UPS parcel on August 16, 2016, without a warrant, without consent, and without any legal justification or probable cause. A search conducted by a private individual at the urging or initiation of the government is not a private search for purposes of the Fourth Amendment. The totality of the circumstances in this case will show this was not a private search.

Additionally, the reply asserts the subsequent search of the parcel by law enforcement officers after Davis' illegal search was not justified. The court should therefore grant the motion to suppress under the fruit of the poisonous tree doctrine. In this case, law enforcement exploited the "private person loophole" to subvert the Fourth Amendment protections to which Washington

was entitled. Only an evidentiary hearing can resolve whether the UPS employee, Andrew Davis, was acting as a private person uninfluenced by the government when he searched the parcel at issue. The evidentiary hearing will also show substantial connection between law enforcement agents and UPS security which prompted Davis to open the parcel on August 16, 2016.

### D. The Evidentiary Hearing

At the beginning of the December 11, 2017 evidentiary hearing, government counsel advised the court and the defense that his opposition contained factual inaccuracies with respect to the contents of the UPS parcel. Specifically, Mr. Knief advised the court and opposing counsel that when he filed his opposition, he believed there was only a single FedEx package inside the larger UPS parcel. However, in preparing for the evidentiary hearing, he learned that there were a number of envelopes and packages inside the UPS parcel.

Mr. Knief also inquired whether the court intended to conduct a *Faretta* canvas inasmuch as Washington had filed an ex parte motion to allow self-representation just prior to the hearing. The court indicated that Washington's pro se motion would be set for a hearing and *Faretta* canvas after the time for filing a response had run. The court directed the government to file a response to that portion of Washington's ex parte motion which requested additional relief such as a request for a six-month continuance of the trial date. The court also directed the government to respond to Washington's contention that AUSA Dan Schiess had a personal relationship with the victims in this case, an issue Mr. Washington has raised multiple times in asserting he was receiving ineffective assistance of counsel, who had declined to file a motion raising the issue.

Since Mr. Washington was represented by counsel and a timely request to continue the hearing had not been filed, the court went forward with the hearing because the motion has been pending since June 29, 2017. A hearing and decision on the merits had been delayed multiple times because Washington has filed multiple motions to dismiss counsel and appoint new counsel, and requested that new counsel amend or modify the motion to suppress because he believes the motion contains "mistakes" and that additional issues should have been raised, but were not in the initial motion. Additionally, the government had brought in two witnesses from Florida to testify at the hearing.

At the evidentiary hearing, the government called two witnesses, Andrew Paul Davis and Detective Julie Foster. After the government rested, the court inquired whether the defense had any evidence or testimony to present. Mr. Washington requested to make a statement to the court. The court advised Mr. Washington that he was not permitted to make statements, but that he was allowed to testify if he so desired. The court canvassed Mr. Washington with respect to his knowledge and understanding of his rights to either testify or not at the evidentiary hearing. Against the advice of counsel, Mr. Washington elected to testify.

## 1. Testimony of Andrew Paul Davis

Mr. Davis has been employed by UPS for approximately 18 years. He is currently an investigator with the Florida security department of UPS and has been for approximately 13 years. His duties include investigating internal and external loss and fraud matters as well as claims. He also inspects packages for restricted items such as illegal narcotics, wine, cigarettes, and things that are not allowed into the UPS system. He routinely opens packages without knowledge of the shipper and receiver. He estimated that on a daily basis, he opens as few as one, and as many as 20 parcels.

On August 16, 2016, he was at the Hialeah hub when a package was brought to his attention by a supervisor who suspected it contained marijuana. The UPS mailing label was printed on a thermal printer. The thermal printer generates a label from heat. Time and exposure to sunlight will cause the label to fade. He identified Exhibit 1 as the UPS box which he received and opened on August 16, 2016. Exhibit 1A is a printout of the shipping label on the box. Both were admitted in evidence. Exhibit 1 is in essentially the same condition as when he saw it except for the fingerprinting on the box and the fact it is no longer sealed. Davis opened the box because a supervisor suspected it contained marijuana.

Prior to opening the box, he was not encouraged by any state, local, or federal law enforcement officer to open the package. No law enforcement officer was aware he was going to open the package before he opened it. It is UPS policy to open a package at the request of law enforcement only with a subpoena. He did not have a law enforcement subpoena or search warrant on the date he opened the package.

When Davis opened the package, he found it contained a large amount of jewelry and postal service shipping boxes and bags, as well as packaging material. Exhibits 2A and 2B are postal shipping boxes contained inside Exhibit 1. Exhibits 3A through 3F were the bags contained inside Exhibit 1. Davis testified that there was jewelry inside Exhibit 1 including rings, watches, earrings. Some of the jewelry was loose within Exhibit 1, and some was inside clear bags. Other jewelry was inside the postal boxes and some of it was inside the postal envelopes inside Exhibit 1. The envelopes inside Exhibit 1 were not sealed.

Detective Julie Foster was inside his office at the time he opened Exhibit 1. She was there for an unrelated matter involving marijuana discovered in another package. Davis did not relay any information regarding Exhibit 1 to Detective Foster before opening the box. UPS did not generate any reports regarding this incident. Exhibits 4, 5, and 6 are photographs of the contents of Exhibit 1 which he removed.

On cross-examination, Davis reiterated that he has been an investigator for UPS for 13 years. He has had 30 years of training in investigations. He was a private investigator for the state of Florida, has conducted investigations for the U.S. Navy and the U.S. Marine Corps, and was involved in a state price-gouging task force after Hurricane Andrew.

He recognized Exhibit 1 as the actual box he opened on August 16, 2016. He testified he recognized the box because "I remember the case. I remember the box. After 13 years, you build a memory." Exhibit 1A is a copy of the label affixed on the upper right-hand corner of the box [Exhibit 1] "if you were to look at the box this way."

Initially Davis thought the box could contain marijuana. When asked why he initially thought the box could contain marijuana, Davis testified that it was because the box originated in Las Vegas. Pretty much of the bulk of marijuana received at UPS in Florida comes from California, Nevada, Colorado, or New Mexico. Additionally, the box was addressed to an area known to receive quantities of marijuana. It was shipped for next day delivery and in a UPS store-branded package. All of these factors combined indicated to him that the box possibly contained marijuana. Davis did not smell the odor of marijuana before opening the box. The label on the

/ / /

13

box stated it weighed 30 lbs. Davis did not weigh the box, but "it seemed in accordance with the label." Depending on the packaging, 30 lbs. of marijuana could fit in Exhibit 1.

Davis estimated he opened the box within five minutes of receiving it. He probably used a pocket knife he always carries while at work as this is typically how he would open a package. He did not believe he wore gloves when opening Exhibit 1. The package was in a sealed condition when he opened it. It was sealed with clear packing tape. He could not recall the number of layers of tape he opened. In court, it looked like the top of the box he opened had one or possibly two layers of tape. The unopened area on the bottom of the box looked like it contained three layers.

During the course of his duties, he would have regular contact with law enforcement officers at least two to three times per week. He would have contact with different groups and different agencies including local law enforcement, DEA, and Secret Service. However, he would not necessarily have contact with the same agents at these agencies. He did not meet regularly with law enforcement agents "per se" unless actively involved in a specific case. He has never trained with law enforcement and has never received direction from a law enforcement officer as a UPS employee. He has dealt with law enforcement task forces from narcotics, anti-terrorism, and fraud over 13 years.

Davis was asked on cross-examination about UPS policy regarding opening packages. He testified that the UPS tariff states that any package in the UPS system is open and available for inspection at any time. He did not know if law enforcement had any input in the development of the UPS tariff.

There were postal boxes inside of Exhibit 1. Postal boxes are generally labeled priority. There was nothing unique about the postal boxes and postal bags he found inside Exhibit 1. There also may have been a Federal Express package inside Exhibit 1, but he did not specifically recall. There was loose jewelry in the outer box and in the inner boxes inside Exhibit 1. The box did not rattle when it was brought into his office. The envelopes inside Exhibit 1 were unsealed. He acknowledged that typically, postal envelopes have a strip covering a label with sticky glue. The plastic strips were on some of the envelopes inside Exhibit 1, but there were not any envelopes inside Exhibit 1 that were sealed even if the plastic stripe on them had been pulled off.

Detective Foster was in the office on an unrelated matter when he opened Exhibit 1. He got Detective Foster involved with the contents of Exhibit 1 after he opened the box. UPS does not receive any type of federal funding to Davis' knowledge.

**2. Testimony of Detective Julie Foster**

Detective Foster has been employed by the Broward County Sheriff's Office for almost 25 years. In the course of her duties she frequently goes to the Hialeah UPS hub to recover property. On August 16, 2016, she was working and was sent to the UPS Hialeah UPS facility. Paul Davis asked that she come to pick up a drug parcel. She arrived with a property receipt to log the shipping information and contents of the drug parcel. She did not recall what the controlled substance was that she was involved in recovering that day.

While she was at the UPS hub, a driver brought in a box for Davis. Davis eventually brought over a handful of jewelry and set it down on the property receipt at the desk where she was filling out her paperwork for the drug parcel. Davis said something to the effect this looks strange. Detective Foster looked at the label and return address on the box from which Davis had recovered the jewelry. She saw that the box came from Las Vegas. She eventually emailed Las Vegas robbery detail with photos of the contents of the box.

Exhibit 7 is a photograph that she took which accurately depicts some of the contents of the package that Davis opened. It is one of the photos that she emailed to Las Vegas police. Davis showed Detective Foster things from the box such as rings and push pins "like you use to pin to a display." There were SKU numbers and price tags attached to the jewelry Davis showed her.

Exhibit 1A appears to be the label she saw on August 16, 2016. She did not know that Exhibit 1 was coming into the UPS hub before Davis showed her the contents. She had no discussion with Davis about Exhibit 1 before he opened it. She did not know that Davis was going to open Exhibit 1 before he did so. She did not encourage him to open Exhibit 1 and had no input into his decision to open the box. She was the only law enforcement officer at the UPS facility at the time. She testified that she just looked at what Davis presented her. She did not open any of the contents of Exhibit 1. She did not break open any seal of the contents of Exhibit 1. She only looked at or examined what Davis showed her.

On cross-examination, Detective Foster testified that she frequently goes to the UPS hub during the course of her duties, at least a couple of times a month. She went to the hub to pick up the drug parcel. She was filling out a property receipt to log the drug evidence on August 16, 2016, when Davis came in and put the jewelry on top of her property receipt saying something to the effect that it looked strange. She had no contact with Davis or the jewelry prior to this.

When she noticed the push pins among the items, she though it was strange and started to make phone calls and eventually emails to Las Vegas. She looked at the label on Exhibit 1 to know who to call for follow up investigation. The box was in the same office at the UPS facility where she was in filling out the property receipt. She testified that Davis and she were at opposite ends of the room. The box was opened when she first saw it. She took four or five pictures of the contents before she called Las Vegas. She believed she was at the UPS office after 10 a.m., but was not sure of the exact time.

Exhibit 1A is a picture of the label on the box. She did not take the picture. The label on the box in court is faded, but she believed the label was in the same location on the box in court as it was when she saw it on August 16, 2016.

She has never had any occasion to direct UPS personnel to open parcels. She is aware UPS has a policy regarding opening packages in their tariff, but does not know the exact wording of the policy.

Detective Foster testified she did not look inside the box, only at what Davis presented. She saw jewelry and some type of popcorn packaging materials used to secure the contents of the box. She did not recall seeing any other boxes or packages from Exhibit 1. The jewelry was placed on a table by Davis and she took pictures of it. She turned a couple pieces of the jewelry to get a clearer shot of SKU numbers or price tags. She did not recall if Davis was wearing gloves. She was not wearing gloves although she acknowledged handling some of the jewelry to photograph it. On August 16, 2016, she was in plain clothes: a t-shirt, jeans, and sneakers.

### 3. Testimony of Joshua Washington

At the conclusion of Detective Foster's testimony, the court inquired of defense counsel whether he had any evidence or testimony he wished to present. Mr. Marchese stated that he had

no evidence or testimony, but that Mr. Washington wanted to say something. Mr. Marchese stated that "for obvious reasons, I've advised him not to say anything." Mr. Washington asked for an opportunity to say something for the record. The court advised him that he could not make arguments to the court or comment on the evidence because he had a lawyer for that, unless and until his request to represent himself was granted. The court again advised Mr. Washington that he had the right to testify or not, that he should confer with his attorney, but that the decision was up to him. After some hesitation, Mr. Washington stated he wished to testify. Mr. Marchese wanted to make it clear that Washington's decision to testify was against his advice.

Mr. Washington took the stand and was sworn. He was asked on direct examination by Mr. Marchese what "issues" he had with Exhibit 1. Mr. Washington testified that Exhibit 1 was not the same box depicted in the pictures. When asked why he believed this, he testified that because of an interview report, "and not just the interview report," he believed the box was opened in Las Vegas first. The reports he has in discovery describing the box in show it is not the same box because, when "she" thought it was suspicious, "she" opened it in Las Vegas. He was then asked on direct examination whether he had any personal knowledge of what the person he was referring to in Las Vegas did. Mr. Washington's initial response to this question was that he and his lawyer had not discussed this matter. The court again inquired whether he wished to testify. Mr. Washington stated he did. He was again asked why he believed that Exhibit 1 was not the box depicted in the pictures produced in discovery. He responded that a girl in Las Vegas opened the box. The court pointed out that the question his lawyer asked was whether Mr. Washington had personal knowledge that the girl in Las Vegas opened the box in Las Vegas. Mr. Washington answered "Yes, Your Honor. I got personal knowledge."

Mr. Washington also testified that he did not believe that Exhibit 1A was a picture of the label on Exhibit 1. When asked why, he testified that the photo of the label, Exhibit 1A, shows the label on Exhibit 1 was on the side of the box, not on the top of the box.

On cross-examination, Mr. Washington was asked whether he had "any issue" that the information on Exhibit 1 was not the same information as on Exhibit 1A. Mr. Washington asked the prosecutor to repeat the question. Mr. Washington was then asked whether he had personal

knowledge of whether the information on Exhibit 1A was any different or modified or changed from the label on Exhibit 1. Mr. Washington responded that, from the pictures it is not the same label. He was asked if he could direct the court's attention to anything different on the label on Exhibit 1 and Exhibit 1A. He responded that the label on Exhibit 1 is faded and he could barely see it. However, he testified he has pictures in discovery which lead him to conclude that "this is not the same box." When asked whether there was anything other than the label to lead him to conclude that Exhibit 1 was not the same box, Mr. Washington responded that "this may be the original." However, he believed the box was switched. It was changed or switched in Miami. He stated he could show this from the exhibits. When asked to clarify, he stated that Exhibits 2A and 2B were not the same boxes placed in Exhibit 1. The boxes in Exhibit 1 were two priority boxes, which were sealed. This is why he believes Exhibits 2A and 2B are not the same boxes that were originally in Exhibit 1. He testified that when the box was mailed, Exhibits 2A and 2B were sealed. The girl (apparently the girl in Las Vegas) said the box was already sealed. She opened one of the boxes.

At this point Mr. Knief requested to confer with Mr. Marchese to clear up the confusion. The court denied the request so that all communications about the topic would remain on the record, and more importantly, so that Mr. Washington could know what was said. Mr. Knief then indicated he would stipulate that the box was opened in Las Vegas by UPS. However, this issue was not addressed in the motion to suppress and the government therefore did not address this in its opposition. Because the UPS person who opened the box in Las Vegas did not bring it to the attention of law enforcement, and the defense did not challenge the search, the government did not respond to this aspect of the case. Mr. Washington then spoke up and said this is one of the things he brought up with his lawyer about modifying the motion.[1] He wanted the issue of UPS personnel

---

[1] Mr. Washington has stated many times that he believes the motion to suppress filed by his first attorney, Rebecca Levy, contains "mistakes" and needed to be modified. The Federal Public Defender's Office assigned a second attorney, Brian Pugh, to review the file and address Mr. Washington's concerns. In one of the many hearings addressing his dissatisfaction with his various lawyers, Mr. Washington stated that Mr. Pugh told him he would not have done anything different. The court gave his second lawyer, Terrence Jackson, additional time to review the motion, review discovery, and discuss the matter with his client to determine whether he believed a supplemental or amended motion to suppress should be filed. Ultimately, Mr. Jackson, decided to file a reply rather than an amended motion. This decision was one of the reasons

opening the box in Las Vegas raised in the initial motion to suppress.

Mr. Knief then went on to question Mr. Washington about whether it was his contention that Exhibits 2A and 2B were different or changed or that Exhibit 1, the outer box, was changed. Mr. Washington responded that it was the two boxes that were changed, and that all of the jewelry was on the inside. He pointed out that in the government's opposition to the motion to suppress, Mr. Knief stated that there was only one FedEx envelope inside the box and it was the only thing inside the box. Mr. Knief then asked Mr. Washington whether he understood that what he put in the motion was different from what the testimony was. Mr. Washington did not appear to understand the question and Mr. Knief withdrew it.

The court then asked Mr. Washington whether his point was that the witnesses testified to something different than what the lawyer claimed in the papers. Mr. Washington responded that there was another small box that was sealed. He knew from another exhibit that there was another small box with a sticker on it labeled 00328, showing it was sealed, that the government did not introduce into evidence at the hearing. While testifying about this, he pointed to a box on the table occupied by government counsel and the case agent.

## DISCUSSION

The Fourth Amendment secures "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment protects reasonable and legitimate expectations of privacy. *Katz v. United States*, 389 U.S. 347, 350–51 (1967). The Fourth Amendment protects "people, not places." *Id*. at 351. Evidence obtained in violation of the Fourth Amendment, and evidence derived from it may be suppressed as the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 484–87 (1963); *United States v. Lundin*, 817 F.3d 1151, 1157 (9th Cir. 2016); *United States v. McClendon*, 713 F.3d 1211, 1215 (9th Cir. 2013) ("Searches and seizures that offend the Fourth Amendment are unlawful and evidence obtained as a direct or indirect result of such invasions is

Washington cited for moving to dismiss Mr. Jackson and appoint new counsel. Mr. Washington has again cited the handling of the motion to suppress as a reason for dismissing his third lawyer, Mr. Marchese, and request to represent himself.

considered 'fruit of the poisonous tree' and is inadmissible under the exclusionary rule.") (citing *Wong Sun*, 371 U.S. at 484–87).

## I. APPLICABLE LEGAL STANDARDS

### A. Evidentiary Hearing

The Ninth Circuit has held that a district court must hold evidentiary hearing if the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the court to conclude that relief must be granted if the facts alleged are proved. *United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000) (citing *United States v. Walczak*, 783 F.2d 852, 857 (9th Cir. 1986); *United States v. Irwin*, 613 F.2d 1182, 1187 (9th Cir. 1980); *United States v. Carrion*, 463 F.2d 704, 706 (9th Cir. 1972). The court need not hold a hearing on defendant's pre-trial motion "merely because a defendant wants one. Rather, the defendant must demonstrate that a significant disputed factual issue exists such that a hearing is required." *Howell*, 231 F.3d at 621 (internal citation omitted). The determination of whether an evidentiary hearing is appropriate rests in the reasoned discretion of the district court. *United States v. Santora*, 600 F.2d 1317, 1320 (9th Cir. 1979).

The motion to suppress did not allege facts with sufficient definiteness, clarity and specificity for the court to conclude that the motion to suppress must be granted if the facts alleged proved true. Rather, the motion argued an evidentiary hearing was required to explore the facts because it was unclear from the discovery produced who did what when. The court exercised its discretion to conduct an evidentiary hearing on Washington's motion to suppress to allow both sides to develop the record in this case. Neither side's moving and responsive papers were supported by a declaration, affidavit, or other persuasive evidence explaining how the evidence in this case was initially obtained, searched, and turned over to law enforcement.

### B. The Private Search Doctrine

The Fourth Amendment protects citizens against unreasonable searches and seizures. A "search" occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. *United States v. Jocobsen*, 466 U.S. 109, 113 (1984). A "seizure" occurs when there is some meaningful interference with an individual's possessory interest in his or her property. *Id.*

Since the early 1920s the Supreme Court has consistently held that the Fourth Amendment protection against unreasonable searches and seizures applies only to government action. *See, e.g.*, *Burdeau v. McDowell*, 256 U.S. 465 (1921). The origin and history of the Fourth Amendment clearly show it was intended as a restriction on government, rather than private action. *Id.* at 576 (stating that the Fourth Amendment "was intended as a restraint upon the activities of sovereign authority, and was not intended to be a limitation upon other than governmental agencies").

In *Burdeau*, the Supreme Court held that even a wrongful search or seizure by a private party does not violate the Fourth Amendment or prevent law enforcement from using evidence unlawfully obtained by a private party or entity. Since *Burdeau* was decided, the courts have consistently held that evidence obtained by a private individual or entity is admissible in a criminal prosecution even if it was obtained in an unlawful manner as long as the private individual was not acting as an instrument or agent of the government. *United States v. Jacobsen*, 466 U.S. 109, 113 (1984); *see also Walter v. United States*, 447 U.S. 649, 656 (1980) (stating, "it has, of course, been settled since *Burdeau v. McDowell* that a wrongful search or seizure conducted by a private party does not violate the Fourth Amendment and that such private wrongdoing does not deprive the government of the right to use evidence that it has acquired lawfully") (internal citation omitted)).

In *Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971), the Supreme Court recognized that the Fourth Amendment prohibits unreasonable intrusions by private individuals who are acting as government instruments or agents. In *Coolidge*, the Supreme Court held that a murder suspect's wife was not acting as an instrument or agent of the police and that evidence she turned over to the police did not amount to an illegal search and seizure. The facts of that case are informative. Coolidge was a suspect in a particularly brutal murder case. He cooperated with police and agreed to take a lie detector test. While he was at the police station taking a lie detector test, plain clothes investigators went to the Coolidge home where Mrs. Coolidge was waiting with her mother-in-law for her husband to return. The two investigators told Mrs. Coolidge that her husband was in "serious trouble" and probably would not come home that evening. They asked the mother-in-law to leave and began questioning Mrs. Coolidge. Mrs. Coolidge told police that her husband had not

been home on the night the murder victim disappeared. The investigators then asked her if her husband owned any guns. Mrs. Coolidge said he did and went to get them in the bedroom. Mrs. Coolidge and the three officers went into the bedroom where Mrs. Coolidge took all four guns out of the closet and gave them to the officers.

The officers also asked Mrs. Coolidge what her husband had been wearing on the night of the disappearance. She produced pairs of pants indicating her husband had probably worn either of the two of them on that evening. She also brought out a hunting jacket. The police gave her a receipt for the guns and the clothing and took them. This evidence was later introduced into evidence at Coolidge's murder trial.

Coolidge was convicted and argued on appeal that this evidence was obtained in violation of his Fourth Amendment right to be free from unlawful searches and seizures. The Supreme Court disagreed finding that the police officers' conduct at the Coolidge house was insufficient to make Mrs. Coolidge's actions their actions for purposes of the Fourth Amendment. The Supreme Court ruled that the purpose of the Fourth Amendment was to prevent police misconduct, not to "discourage citizens from aiding to the utmost of their ability in the apprehension of criminals." *Id.* at 488. The Supreme Court found that Mrs. Coolidge produced the guns and clothes to the officers of her own accord and agreed to let the officers take the items. Under these circumstances, the Supreme Court concluded that it was not an unlawful search and seizure, and Mrs. Coolidge was not acting as an agent or instrument of the government in turning these items of evidence over to the police. *Id.* at 489 ("There is not the slightest implication of an attempt on their part to coerce or dominate her, or, for that matter, to direct her actions…. To hold that the conduct of the police here was a search and seizure would be to hold, in effect, that a criminal suspect has constitutional protection against the adverse consequences of a spontaneous, good-faith effort by his wife to clear and remove suspicion.")

A defendant challenging a search and seizure has the burden of showing government action. *United States v. Gumerlock*, 590 F.2d 794 (9th Cir. 1979) (en banc). In *Jacobsen*, 466 U.S. 109, the Supreme Court addressed whether the search and seizure involved in that criminal prosecution violated the defendant's Fourth Amendment rights. There, a FedEx supervisor asked

the office manager to look at a package that had been damaged and torn by a forklift. The package was opened by Federal Express personnel. Inside the box were five or six pieces of crumpled newspaper, which covered a tube that was made of silver tape used on basement ducts. The supervisor and officer manager cut open the tube, found a series of zip lock plastic bags containing about 6 ½ oz. of white powder. When they observed the powder, they notified the DEA, replaced the plastic bags inside the tube, and put the tube and newspaper back into the box. DEA agents arrived, removed the tube from the box, the plastic bags from the tube and filed tested it for cocaine.

The Supreme Court held that the federal agents who examined and tested the contents of a damaged package and its contents did not conduct a search within the meaning of the Fourth Amendment. It found the officers' actions did not violate the Fourth Amendment because the defendants had no privacy interest in the contents of the package after Federal Express employees opened and examined the package of their own accord and "invited the federal agent to their offices for the express purpose of viewing its contents." 466 U.S. at 119. The Supreme Court held that "the agents viewing of what a private party had freely made available for his inspection did not violate the Fourth Amendment." *Id*. The Supreme Court also held that "the removal of the plastic bags from the tube and the agent's visual inspection of their contents enabled the agent to learn nothing that had not previously been learned during the private search." *Id.* at 120. As such, it was not a "search" for purposes of the Fourth Amendment protection against unreasonable searches and seizures. The Supreme Court concluded that "the federal agents did not infringe any constitutionally protected privacy interest that had not already been frustrated as a result of the private conduct. To the extent that a protected possessory interest was infringed, the infringement was *de minimis* and constitutionally reasonable." *Id.* at 126.

The Ninth Circuit has long recognized that "the Fourth Amendment generally does not protect against unreasonable intrusions by private individuals." *United States v. Reed*, 15 F.3d 928, 930–31 (9th Cir. 1994) (citing *United States v. Walter*, 652 F.2d 788, 791 (9th Cir. 1991)). Courts must apply a two-part test to determine whether a search was conducted by a private individual acting in a private capacity or as a government instrument or agent. *United States v Miller*, 688 F 2d 652, 657 (9th Cir. 1982). The court determines first whether the government

knew of and acquiesced in the intrusive conduct, and second, whether the individual or entity performing the search intended to assist law enforcement efforts or to further his own ends. *Id.*

## II.    ANALYSIS AND DECISION

The court finds Washington has failed to establish by a preponderance of the evidence that Andrew Davis, the UPS security investigator who opened the UPS parcel at issue, acted as a government instrument or agent.  Washington has also not established that Detective Foster exceeded the scope of the private search conducted by Davis when she examined the UPS parcel and its contents, or when she photographed the items Davis presented to her.  The testimony of Mr. Davis and Detective Foster was credible and uncontroverted.

Davis testified that he opened the UPS package after a driver brought it to the attention of a supervisor who brought the package to him.  The UPS tariff states that any package in the UPS system is open and available for inspection at any time.  Davis testified he believed the package could possibly contain marijuana because the box originated in Las Vegas, the bulk of marijuana received at UPS in Florida comes from California, Nevada, Colorado, and New Mexico, and the box was addressed to an area in Miami known to receive quantities of marijuana.  Additionally, it was shipped for next day delivery in a UPS store branded package.  All of these factors combined made him conclude that the box possibly contained marijuana.  He also testified that no law enforcement officer encouraged him to open the package.  No law enforcement officer was aware he was going to open the package before he did so.  It is UPS policy to open a parcel at the request of law enforcement only with a subpoena and no subpoena was involved.  Davis did not relay any information to Detective Foster who was in his office to log and collect an unrelated drug parcel about the UPS parcel before opening it.  Davis also unequivocally testified that he never received direction from law enforcement as a UPS employee.

Similarly, Detective Foster's testimony was uncontroverted.  Both Foster and Davis stated she was at the UPS office in the Hialeah hub to recover a drug parcel in an unrelated case.  She did not know the parcel involved in this case was coming into UPS while she was there.  She had no discussion with Davis about the parcel before Davis opened it.  She did not know Davis was going to open the parcel.  She did not encourage Davis to open the parcel.  She had no input into

his decision to open the parcel. She did not open any of the contents of Exhibit 1 or break open the seal of any of the contents of Exhibit 1. Rather, she only examined and photographed what Davis showed her, although she acknowledged she moved the jewelry on the desk to get a better photograph of the tags on it for Las Vegas police.

Washington did not provide any evidence or testimony refuting the testimony of either Mr. Davis or Detective Foster regarding the search of the package in Florida. Rather, he seems to challenge whether the Exhibit 1 and its contents are in the same condition as when they were shipped because he has discovery indicating a UPS employee opened the package and/or its contents in Las Vegas before shipping it.

Government counsel agreed to stipulate the package was opened in Las Vegas by a UPS employee. However, this issue was not raised in the motion to suppress or reply. Moreover, there is nothing in the record to suggest that the UPS employee who opened the package in Las Vegas before shipping it to Florida had any contact with anyone in law enforcement who requested, induced or caused her to open the package. As the court has explained the Fourth Amendment does not protect against unreasonable intrusions by private individuals. A defendant seeking suppression of evidence under the Fourth Amendment has the burden of showing that a private person conducting the search was an instrument or agent of the government. This Washington did not do.

### CONCLUSION

The court finds that the search of the UPS parcel in Florida was a private search conducted by a UPS security investigator. Washington has not met his burden of showing that Davis acted as an instrument or agent of the police when he opened the package and examined its contents. Detective Foster's viewing of what Davis had freely made available for her inspection did not violate Washington's Fourth Amendment rights to be free from unreasonable searches and seizures. She did not infringe on any constitutionally protected privacy interest that had not already been frustrated by Davis' private conduct.

For the reasons stated,

/ / /

**IT IS RECOMMENDED** that Defendant Joshua Sadat Washington's Motion to Suppress (ECF No. 54) be **DENIED**.

Dated: January 5, 2018

_____
Peggy A. Leen
United States Magistrate Judge

<u>NOTICE</u>

This Report of Findings and Recommendation is submitted to the assigned district judge pursuant to 28 U.S.C. § 636(b)(1) and is not immediately appealable to the Court of Appeals for the Ninth Circuit. Any notice of appeal to the Ninth Circuit should not be filed until entry of the district court's judgment. *See* Fed. R. App. P. 4(a)(1). Pursuant to LR IB 3-2(a) of the Local Rules of Practice, any party wishing to object to a magistrate judge's findings and recommendations of shall file and serve *specific written objections*, together with points and authorities in support of those objections, within 14 days of the date of service. *See also* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6, 72. The document should be captioned "Objections to Magistrate Judge's Report of Findings and Recommendation," and it is subject to the page limitations found in LR 7-3(b). The parties are advised that failure to file objections within the specified time may result in the district court's acceptance of this Report of Findings and Recommendation without further review. *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003). In addition, failure to file timely objections to any factual determinations by a magistrate judge may be considered a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the recommendation. *See Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991); Fed. R. Civ. P. 72.